UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO.: 1:19-CR-96-HAB |
| | ) | |
| ARMANDO VONGPHACHANH | ) | |

**OPINION AND ORDER**

The Government charged Defendant, Armando Vongphachanh ("Vongphachanh"), in a single count indictment with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).  (ECF No. 1).[1] This matter is before the Court on the Defendant's Motion to Suppress Evidence (ECF No. 22) filed on September 24, 2020. The Defendant requests that the Court suppress the evidence obtained from the search of the vehicle in which he was the driver at the time of his arrest on September 25, 2019 as well as exclude any statements he made to detectives during his custodial interview.

On February 12, 2021, the Court held an evidentiary hearing on the motion. After the filing of the transcript from that hearing, the Defendant filed an opening brief (ECF No. 40) to which the Government responded on May 24, 2021, (ECF No. 42) and the Defendant replied on June 1, 2021 (ECF No. 43). Because the Court concludes that the officer did not have an objectively reasonable basis to conduct a stop of the Defendant, the Court will GRANT the Defendant's Motion to Suppress.

**FACTUAL BACKGROUND**

---

[1] The Indictment also contains a forfeiture allegation.

As set out above, the Court conducted an evidentiary hearing wherein the Government presented several witnesses including the officer that conducted the initial stop of Vongphachanh and the detectives that interviewed him after he was taken into custody. Additionally, the Government submitted in-car video of the stop and video of the custodial interview that followed. Because the Court cannot square the testimonial evidence related to the decision to stop Vongphachanh with the video evidence submitted, the Court shall first begin its factual discussion with the events as they transpired according to the officer conducting the stop followed by this Court's findings as to the video evidence.

On September 25, 2019, Officers Christopher Brautzsch (Officer Brautzsch) and Officer K. Diller[2] with the Fort Wayne Police Department (FWPD) were on third shift patrol in the area of Lafayette and Rudisill streets in Fort Wayne, Indiana. At approximately 1:55 a.m., as Officer Brautzsch was traveling northbound on Lafayette approaching Rudisill, he observed a firetruck with its lights employed attempting to back into the fire station on the northeast corner of Rudisill and Lafayette. (Evid. Hr'g Tr., ECF No. 41, at 9, 24). The fire engine had its emergency lights on but was not using its siren. (*Id.*). Other firefighters were also outside directing traffic using flashlights to assist. Officer Brautzsch observed traffic getting ready to cross the intersection heading towards the fire engine. (*Id.* at 10). In particular, Officer Brautzsch noticed a silver minivan that was traveling eastbound on Rudisill. That vehicle traveled through the intersection of Lafayette toward the fire engine. As it got closer to the fire engine, the fire engine operator sounded its air horn "because it appeared like the vehicle was heading directly at it." (*Id.* at 10). The minivan

---

[2] Officer Diller was a rookie at the time of these events. (Hr'g Tr. at 25). He did not testify at the evidentiary hearing and is mentioned only in passing in the parties' briefing. The Court includes his name here for context only.

2

continued its path along Rudisill and, once the fire engine's air horn sounded,[3] Officer Brautzsch testified that he observed the van swerve into the bike lane on the far south side of Rudisill. (*Id.*). Officer Brautzsch then pulled his patrol car behind the minivan and activated his lights. The minivan immediately turned into the parking lot of Arby's, which is directly across from the fire station and came to a halt in a parking spot. Officer Brautzsch testified on direct examination that he believed the van turned into the Arby's in response to his activation of his lights.

Officer Brautzsch approached the driver's side of the van and encountered Vongphachanh as the driver and Madison Thomas (Thomas) as a front seat passenger. Upon approach, Officer Brautzsch immediately smelled a strong odor of marijuana and cologne emanating from the minivan. (Hr'g Tr. at 11).[4] Vongphachanh also appeared nervous and his hands were shaking when he reached for his wallet to provide identification. (*Id.* at 17). While standing at the driver's side of the minivan, Officer Brautzsch noticed a blunt (hand rolled marijuana cigarette) inside the driver's door. (*Id.* at 18). At that point, both Vongphachanh and his passenger were removed from the vehicle, patted down, and walked to the rear of the minivan. Other officers that had arrived on the scene stayed with the two vehicle occupants while Officers Brautzsch and Diller conducted a search of the minivan. During that search various items of contraband were located, including a Ruger P98, 9mm firearm and a black gym bag containing a hodge-podge of pills, marijuana, and a digital scale. Both Vongphachanh and Thomas were handcuffed, placed into squad cars, and Mirandized.

---

[3]It is unclear whether Officer Brautzsch actually heard the air horn being sounded from inside his squad car or whether this information was provided to him sometime later. There is no mention of an air horn in the Affidavit for Probable Cause, submitted to the Court as Defendant's Ex. A.

[4]Despite the strong marijuana smell coming from the car, Officer Brautzsch testified that Vongphachanh did not appear to be under the influence of alcohol or drugs at the time of the stop and he did not have difficulty communicating with Vongphachanh. (*Id.* at 13). Also, no OWI protocol was used because the officers had no reason to believe he was impaired.

3

Eventually Vongphachanh was interviewed at the Fort Wayne Police Department by Task Force Officers Caleb Anderson and Phillip Ealing and made incriminating statements regarding items found in the minivan.[5]

The in-car video from the patrol car was admitted as Government's Exhibit 3 at the hearing. Officer Brautzsch testified that from the time he activated his lights and/or siren, the video backtracks 30-45 seconds to provide context of events occurring immediately before the activation of the lights. (Hr'g Tr. at 23). This Court has reviewed the video footage multiple times in real time and, from the camera's perspective, which is presumably the perspective of Officer Brautzsch while approaching the intersection, the Court concludes Officer Brautzsch could not have observed Vongphachanh "swerve" as he testified. The footage is dark and grainy, accurately reflecting the early morning hours of the encounter and, as the patrol car approaches, the glaring lights from the fire truck partially impair visibility. However, what Government's Exhibit 3 does not conclusively show is the minivan quickly or abruptly swerving into the bike lane, as the Government argues. (Gov't Resp., ECF No. 42 at 11: "He then had to quickly swerve into the bike lane to avoid the fire truck."). A fair interpretation of the footage shows the van slow as it approached the stationary fire truck. After slowing, it then moves into the bike lane to proceed around the fire truck (which was in his lane of traffic) and facilitate its turn into the Arby's parking lot directly across from where the fire truck was located. At the time the van enters Arby's, the in-car video is at :43. Even assuming the video reflects a 30 second spool back (as opposed to 45 seconds) from the activation of the lights, the Court cannot conclude that the minivan proceeded into the Arby's to either evade police or, in direct response to the officer's activation of his lights, as Brautzsch implied on direct examination. Rather, the Court's view of the video is entirely consistent with Officer Brautzsch's

---

[5] Although the task force officers testified at the evidentiary hearing regarding the custodial interrogation, the Court need not recite those facts here in light of the outcome of this motion.

4

testimony on cross-examination, where he appears to concede that all the events took place simultaneously:

> Q. …And your testimony is that the minivan had swerved prior to you getting behind the minivan?
> A. Yes.
> ….
>
> Q. …So you put on your lights, and that's what caused the minivan to pull into the Arby's?
> A. Once I got behind the minivan, I believe it went into the Arby's as I was activating my lights.
> Q. Okay. So it's possible that the minivan was pulling into Arby's before the driver would have seen your lights?
> A. Possible.
> Q. Okay. Because it's happening pretty simultaneously?
> A. Yes.

(Hr'g Tr. at 25). Moreover, the Court finds credible portions of Thomas's testimony, specifically the portion of her testimony where she describes what happened immediately after entering the intersection of Rudisill and Lafayette. Thomas, who was approximately 7 months pregnant at the time of the stop, testified that she felt ill and told Vongphachanh to pull into the Arby's parking lot. She further testified that while she saw the firetruck backing into the station, the van did not swerve into the bike lane, but was in the bike lane to turn into the Arby's across the street from the fire station. (Hr'g Tr. 80-82).[6]   Officer Brautzsch confirms the substance of Thomas's testimony in that he testified that when he approached the driver's side of the car, Vongphachanh told him Thomas was "going to be sick." (Hr'g Tr. at 32).

Moreover, while Officer Brautzsch testified at the hearing that the minivan swerved into the bike lane, in the video, he tells other officers that he stopped the minivan "because he cut off

---

[6]The Court further notes that the in-car video also confirms Thomas' testimony that she felt nauseated. Consistent with Officer Brautzsch's testimony, the video reflects that Vongphachanh told the officers nearly immediately after they approached the driver's side door that Thomas felt ill. Discussion then ensued from the officers as to whether she needed medical assistance.

5

the … he cut off the [emergency vehicle]."[7] (Gov't Ex. 3 at 8:19-23). Officer Brautzsch quickly adds "he didn't yield to the fire truck." (*Id.* at 8:30).

## DISCUSSION

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. Ordinarily seizures are "reasonable" only when supported by probable cause to believe an individual has committed a crime. See, *e.g.*, *Dunaway v. New York*, 442 U.S. 200, 213 (1979); *Bailey v. United States*, 568 U.S. 186, 192 (2013); *Matz v. Klotka*, 769 F.3d 517, 522 (7th Cir. 2014). Here, the Government asserts that Vongphachanch's commission of a traffic offense provided the requisite probable cause for the officers to stop and "seize" the minivan.[8]

The Government justifies the stop of the minivan based upon Ind. Code § 9-21-8-35 which makes it a Class A infraction to disregard an emergency vehicle. This statute, however, contains two separate standards of conduct for drivers depending upon whether the emergency vehicle is "immediately approaching" (*Id.* at subsection (a): "upon the immediate approach of an authorized emergency vehicle…") or stationary (*Id.* at subsection (b): "upon approaching a stationary authorized emergency vehicle…"). In the first instance, when the emergency vehicle is "giving audible signal by siren or displaying alternately flashing red, red and white or red and blue lights," a driver is required to yield, pull to the right hand edge or curb, or stop and remain in position until the authorized emergency vehicle has passed. Ind. Code § 9-21-8-35 (a) (1) – (3). In the latter instance, the statute applies only if the emergency vehicle is giving a signal by displaying "alternately flashing red, red and white, or red and blue lights" (no siren is required). In such an instance, depending upon the number of highway lanes proceeding in the same direction, a driver

---

[7] Another officer added the words "emergency vehicle" to which Officer Brautzsch responded "right."

[8] The Government does not assert that the stop was justified under the reasonable suspicion standard set out in *Terry v. Ohio,* 392 U.S. 1 (1968).

must either "yield the right of way by making a lane change into a lane not adjacent to that of the authorized emergency vehicle" or if less than four (4) lanes, "proceed with due caution, reduce the speed of the vehicle to a speed at least ten (10) miles per hour less than the speed limit "if changing lanes would be impossible…" Ind. Code § 9-21-8-35 (b) (1) – (2). According to the Government, Officer Brautzsch's testimony that he observed the minivan fail to yield for the emergency vehicle in the roadway "gave probable cause to stop the vehicle."

To justify a traffic stop, it is sufficient if a reasonable officer would believe that the defendant has committed a traffic violation; it is not necessary that this traffic violation actually occurred, nor does it matter if the officer had an ulterior motive for initiating the stop. *See Jones v, City of Elkhart*, 737 F.3d 1104, 1114 (7th Cir. 2013)(citing *United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005) ("we need only inquire whether the officer had probable cause to believe that a traffic violation occurred, not whether [the driver] actually was tailgating); *United States v. Cashman*, 216 F.3d 582, 586-87 (7th Cir. 2000) ("The pertinent question ... is whether it was reasonable for [the officer] to *believe* that the windshield was cracked to an impermissible degree.")). Indeed, even if an officer was mistaken about whether the defendant's conduct was ultimately illegal, the stop is justified at its inception provided the mistake was objectively reasonable. See *Heien v. North Carolina*, 574 U.S. 54, 66 (2014) ("The Fourth Amendment tolerates only reasonable mistakes, and those mistakes—whether of fact or of law—must be *objectively* reasonable."). The Court's focus then is on whether Officer Brautzsch had an objectively reasonable basis to believe a traffic violation had occurred. *See United States v. Reeves*, 796 F.3d 738, 741 (7th Cir. 2015). "Other actual motivations of the police officer bear no weight on the 'constitutional reasonableness' of traffic stops." *United States v. Smith*, 668 F.3d 427, 430 (7th Cir. 2012).

Defendant asserts that Vongphachanh did not violate Indiana Code § 9-21-8-35 and cites to an Indiana state court appellate opinion for the proposition that where officers are mistaken about what the law required of a motorist with regard to a traffic statute, the stop of the vehicle is not justified and objectively unreasonable. *See State v. Rager*, 883 N.E.2d 136,140 (Ind. Ct. App. 2008). In that case, the defendant failed to change lanes as he approached a stationary police car that was involved in a roadside traffic stop. That officer then radioed ahead to other officers on the roadway who conducted a stop of the defendant's pick-up truck. The officers noted a strong odor of alcohol coming from the vehicle and the defendant was arrested and charged with operating while intoxicated. In reviewing the state's appeal of the trial court's grant of the defendant's motion to suppress, the court affirmed writing:

> We conclude that Deputy Feller mistakenly believed that Rager violated the statute. State Road 9 was not a four-lane highway at the site of Deputy Feller's traffic stop, and therefore Rager was not required by statute to change lanes as he approached Deputy Feller's vehicle. Moreover, Deputy Feller had no idea whether Rager reduced the speed of his vehicle as he approached the site of the traffic stop, and there is no indication that Rager was maintaining an unsafe speed for the existing road conditions. After viewing the videotape of the traffic stop recorded from Deputy Feller's vehicle, the trial court remarked that it did not "see much difference" in the speed of Rager's truck compared with the speed of the other passing vehicles. Tr. at 17. Under these circumstances, we conclude that Deputy Feller, and by extension Marshal Fennell, did not have an objectively justifiable reason to stop Rager's vehicle.

*Rager*, 883 N.E.2d at 140. While this case is without precedential value to this Court, it is informative and aids in this Court's ultimate conclusion that the stop in this case lacked the foundation for objective reasonableness necessary to justify it.

Here, based upon this Court's review of the in-car video, we cannot give the officer the benefit of the doubt that he observed the minivan violate Ind. Code § 9-21-8-35. Nor can we conclude that he was mistaken about the justification for the stop or that the mistake was

8

objectively reasonable under the circumstances. Under either subsection of § 9-21-8-35 (b), Vongphachanh was not required to stop. At most (depending on the number of lanes), he was required to proceed with due care and "yield the right-of-way by making a lane change." He did so.[9] From his viewpoint, Officer Brautzsch could not have harbored an objectively reasonable belief otherwise.

The Court emphasizes that the holding in this case is to be read narrowly; officers are permitted to make reasonable mistakes of fact and law without having their judgment overturned by the armchair quarterbacking of judges. However, the Seventh Circuit has described "the resolution of a motion to suppress" as a "fact-intensive inquiry" in which the district court must make "credibility determinations" based on "its opportunity at the suppression hearing to hear the testimony and observe the demeanor of the witnesses." *United States v. Kempf*, 400 F.3d 501, 503 (7th Cir. 2005); see also *United States v. Springs*, 17 F.3d 192, 194 (7th Cir. 1994) (explaining the deference given to the credibility determinations of the district judge who has "heard the conflicting testimony, observed the witnesses, and then reached a determination about whom to believe"). From the evidence presented to this Court, and as a factual matter, the Court cannot conclude that Officer Brautzsch, or any reasonable officer, could have formed an objectively reasonable belief that the Defendant violated any traffic law, especially given the in-car video. From his vantage point in the vehicle as well as his proximity from where the alleged violation occurred, the Court cannot credit Officer Brautzsch's version of events that the Defendant "swerved" as opposed to doing precisely what the law permits – move into an adjacent lane (here, the bike lane) to yield the right of way to the emergency vehicle. *See* Ind. Code § 9-21-8-35 (b)(1)

---

[9] Further, it is permissible to enter a bicycle lane to make a right turn when it is safe and unobstructed of all cyclists. City of Fort Wayne Ordinance, § 71.07. Given that it was the early morning hours and approximately 1:55 a.m., there were no cyclists in the bicycle lane when Vongphachanh moved into the bike lane which, in turn, facilitated his right turn into the Arby's.

(requiring motorist to yield "by making a lane change). Further, the video, which obviously reflects the darkness of the hour and the glare from the flashing lights of the fire truck as the squad car approached, does not provide a vibrant platform from which the officer could have viewed the events. *See United States v. Sanders*, No. 3:20-CR-50 DRL-MGG, 2020 WL 5877890, at *4 (N.D. Ind. Oct. 2, 2020) (finding it objectively reasonable for officer to believe subject vehicle didn't come to a full stop because he viewed the vehicle in three dimensions, with the benefit of a clear picture and proximity).

At most, the video demonstrates that the minivan used due caution when it slowed its speed and moved into the bike lane to yield the right-of-way to the fire truck. In fact, an actual lane change into an adjacent lane (other than the bike lane) was impossible given the location of the fire truck across multiple lanes of traffic. Thus, the Court concludes that there was an absence of probable cause for the stop and a violation of the Defendant's Fourth Amendment rights.

Under the exclusionary rule, evidence obtained through unreasonable searches and seizures must be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963). This doctrine prohibits the admission of any subsequently obtained evidence, including information, objects, or statements. *Id.* But for the unjustified stop of the minivan, Defendant's vehicle would not have been searched nor would he have been subject to a custodial interrogation. For this reason, the Court need not address Defendant's secondary argument that the statements elicited were the product of a coercive interrogation. The Court suppresses all evidence found during the search and all statements made during the custodial interrogation. The Motion to Suppress is GRANTED.

## CONCLUSION

Based on the foregoing, the Defendant's Motion to Suppress (ECF No. 22) is GRANTED.

SO ORDERED on June 15, 2021.

s/ Holly A. Brady  
JUDGE HOLLY A. BRADY  
UNITED STATES DISTRICT COURT